(Nos. 32390 and 32391.—

ROBERT S. ABBOTT PUBLISHING COMPANY, Appellant, *vs.* FRANK ANNUNZIO, Director of Labor, *et al.*, Appellees.

*Opinion filed March 23, 1953—Rehearing denied May 18, 1953.*

PRESCOTT, BURROUGHS & TAYLOR, and MILTON M. LAFF, both of Chicago, (EUCLID L. TAYLOR, of counsel,) for appellant.

IVAN A. ELLIOTT, Attorney General, of Springfield, (WILLIAM C. WINES, RAYMOND S. SARNOW, and A. ZOLA GROVES, of counsel,) for appellee the Director of Labor; LEON M. DESPRES, of Chicago, (SAMUEL D. GORDON, of counsel,) for appellees George Christly *et al.*

Mr. JUSTICE MAXWELL delivered the opinion of the court:

We here have two appeals under the provisions of the Administrative Review Act of this State, both involving the issue of unemployment benefits claimed by certain employees under the Illinois Unemployment Compensation Act. The issues in both cases are the same and they have been here consolidated for opinion.

The Robert S. Abbott Publishing Company, appellant, hereinafter referred to as employer, is engaged in the printing and publishing business in the city of Chicago. The appellees in one case (other than the Director of Labor) were composing room employees, and in the other case appellees were the mailing room employees, all claiming benefits for a certain period of unemployment, caused by a work stoppage attributed to a labor dispute.

The factual situation of the composing room employees is more complicated than that of the mailing room employees and we shall first discuss the interpretation of the statute and the legal issues involved as to the composing room employees, alone.

A deputy of the Division of Unemployment Compensation determined that all composing room workers, subject to the bargaining jurisdiction of Chicago Typographical Union No. 16 and in the employ of the employer, were ineligible for unemployment compensation benefits from December 6, 1947, until such date as their unemployment was no longer due to a stoppage of work which existed because of a labor dispute. On individual appeals, claimants alleged to the Director of Labor that the circumstances of their continued unemployment had changed and that they were no longer unemployed due to a stoppage of work which existed because of the labor dispute at the premises at which they were last employed. The deputy's second determination still found claimants ineligible for benefits and an appeal to the Director of Labor followed. The Director of Labor found and determined that claimants were entitled to benefits commencing July 10, 1948, and this decision was then appealed to the superior court of Cook County which affirmed the decision of the Director of Labor.

The essential facts in the record of this case disclose that the employer is engaged in the business of publishing a weekly newspaper in addition to printing under contract for others. The employer employs approximately 140 workers, 28 of whom are employed in the composing room as linotype, monotype, hand operators, make-up men, proof readers and machinists, both journeymen and apprentices. Claimants were all workers in this composing room under the foregoing classifications.

The terms and conditions of employment of the claimants during the period in question were not reduced to any formal labor contract between the employer and the union but were determined by the labor contract which existed between the union and the Chicago Newspaper Publishers Association, said association being composed of the five metropolitan daily newspapers published in the

city of Chicago. Although not a member of said association, the employer provided wages and working conditions for its composing room workers similar to those announced in the formal agreement between said association and the union. The last such contract expired October 20, 1947. Negotiations between claimants and employer for new terms and conditions followed. On November 24, 1947, the association advised the union that it would not meet the new wage scale demands, and on the evening of the same day the composing room workers of the five metropolitan Chicago daily newspapers left their jobs. A union representative testified that the wage scale demands applied to all union members employed by any company which traditionally paid the prevailing newspaper scale; this included composing room workers of the employer. Claimants, however, did not leave their jobs on November 24, 1947, but on the following day the employer received a telegram from the union president advising of the new wage scale voted by the union. Claimants requested a decision from the employer on the same day. On the following day claimants indicated they could not continue working unless the new wage demands were met and on November 26, 1947, the employer advised claimants that the new wage scale would be paid temporarily from the date of the union's telegram. On December 4, 1947, the employer, in a letter replying to said telegram, advised the union that the temporary arrangement of payment of the new wage scale would be terminated December 5, 1947, and that thereafter the wage scale in effect prior to November 25, 1947, would prevail. Without going into the details, it is sufficient to state that a strike followed and that there was a cessation and stoppage of work in the employer's composing room on December 6, 1947. Substitute processes were adopted by the employer to continue business for approximately four weeks. During the week of February 7, 1948, the company commenced to

hire workers for the composing room to fill the vacancies created by the absence of claimants, and by April 17, 1948, all of the news items appearing in employer's paper were set in type in the usual and normal way. However, most of the advertising still was being prepared by the substitute photoengraving process. A survey of employment data from the composing room during this period reveals that by July 10, 1948, the company had employed in the shop the same number of workers which were usually and normally employed prior to the time of the strike controversy. These newly employed workers, when qualified, were paid at the rate prevailing November 24, 1947, and enjoyed all privileges extended to regular employees of the employer.

The evidence further disclosed that the employer's composing room occupied a separate area within the company premises. The claimants were all subject to the jurisdiction of the union and were the only workers of the employer subject to this particular union. Negotiations between the union and employer were of no avail. During all of the time of the controversy the employer published its weekly newspaper. There is no question that all the claimants were employed by the employer up to December 6, 1947, when they became unemployed by reason of the controversy concerning the new wage scale. They thereafter filed claims for unemployment compensation benefits and, as hereinbefore stated, the deputy determined they were ineligible to receive benefits by reason of the provisions of section 7(d) of the Unemployment Compensation Act. Ill. Rev. Stat, 1949, chap. 48, par. 223.

The issue presented here is whether a claimant who in the first instance is ineligible to receive benefits where his original unemployment was due to a stoppage of work because of a labor dispute at the plant of his employer, is later entitled to receive benefits when that employer's plant is operating at full production, claimant has been perma-

nently replaced, and a full force of workers is employed at the employer's plant. The answer to this problem lies in the interpretation of section 7 of the Unemployment Compensation Act which reads as follows: "An individual shall be ineligible for benefits—* * * (d) For any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed, provided, that this subsection shall not apply if it is shown that (1) He is not partipicating in or financing or directly interested in the labor dispute which caused the stoppage of work and (2) He does not belong to a grade or class of workers of which immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that if in any case seperate branches of work which are commonly conducted as separate businesses in separate premises are conducted in separate departments of the same premises, each such department shall, for the purpose of this subsection, be deemed to be a separate factory, establishment, or other premises."

The facts as hereinabove stated are substantially those contained in the findings of fact of the administrative agency which heard this case. These findings are now attacked by the employer in this court and from our examination and review of the record we cannot say that they are manifestly against the weight of the evidence in this case. The questions as to whether claimants were replaced and full production resumed are questions of fact resolved by the Director of Labor. This court is without power to disturb findings of fact which are not manifestly against the weight of the evidence and where there is evidence in the record to substantiate such findings. *Mohler*

v. *Department of Labor,* 409 Ill. 79; *Oswald* v. *Civil Service Com.,* 406 Ill. 506; *Local Number 658* v. *Brown Shoe Co.,* 403 Ill. 484.

The employer has also questioned the rights of claimants to benefits for the alleged reason that they did not qualify under section 6 of the Illinois Unemployment Compensation Act. The employer did not raise this question by notice as required by the regulations of the Director · of Labor and also failed to urge the same at the time of hearing, and we, therefore, hold that it is foreclosed from urging such matters on review in this court. In the case of *Victor Chemical Works* v. *Industrial Board,* 274 Ill. 11, we held that a defense to a claim under the Workmen's Compensation Act must be raised before the administrative board and that the employer could not remain silent there and be free to raise said defense on review in this court. It is a general rule, subject to some limitations and exceptions, that an appellate court will consider only such questions as were raised and reserved in the lower court. The same principle, based upon the demands of orderly procedure and the justice of holding a party to the results of his own conduct where to do otherwise would surprise his opponent and deprive him of an opportunity to contest an issue in the tribunal which by law is supposed to decide it, although sometimes derived from statutes, applies on review by courts of administrative determinations, so as to preclude from consideration questions or issues which were not raised in the administrative proceedings. Thus, a defense not presented in the administrative tribunal may not be raised in the court on review, and courts have declined to hear objections to the admissibility of evidence, the qualifications of an expert witness, the form of questions to witnesses, or the reopening of a proceeding, where such objections were not made in the proceeding below. Similiarly, where a party has presented his case or defense to a commission upon a certain

and definite theory, he will not be permitted to change in court and prevail upon another theory and issue not presented to the commission. 42 American Jurisprudence 675-6.

The question at issue which now confronts us has never been passed upon in this court. The majority rule appears to have been followed by courts of review in Georgia, Maryland, Michigan, Indiana, Arizona, Nebraska, and North Carolina, and by administrative decisions in Connecticut, Indiana, Maryland, Montana, Missouri, Nebraska, New Hampshire, New Jersey, North Dakota, Oklahoma, Oregon, and Utah, and also by an administrative decision of the U.S. Veterans Administrator. The minority rule appears to be embodied in the decision of the Oklahoma Supreme Court in the case of *Board of Review* v. *Mid-Continent Petroleum Corp.* 193 Okla. 36, 141 Pac. 2d 69. The minority rule was followed in one administrative decision in Colorado. Briefly stated, the majority rule holds that where the employer has permanently replaced all the employees whose employment was terminated in the course of a labor dispute, has fully resumed its normal plan of operations and resumed previous production, then the unemployment of its former employees is no longer due to a stoppage of work because of a labor dispute at the employer's plant. The result of this ruling, if followed by this court, is to hold that unemployed claimants are no longer ineligible for benefits under the Illinois Unemployment Compensation Act upon cessation of the work stoppage.

Little assistance can be obtained from any of our former decisions concerning section 7(d), for the reason that the precise question has never before been raised. In the case of *Walgreen Co.* v. *Murphy,* 386 Ill. 32, we declared that a "strike in the labor sense is generally defined as a stoppage of work by common agreement of a body of working men for the purpose of obtaining or resisting a change in the

conditions of employment. [Citation.] The manifest legislative intent is that 'stoppage of work' was deemed synonymous with 'strike.' A contrary construction would, in effect, attribute to the General Assembly an intent to finance strikes out of unemployment compensation funds." (Citing *Board of Review* v. *Mid-Continent Petroleum Corp.*, 193 Okla. 36.) We further declared in the *Walgreen case* that the policy motivating this legislation is specifically declared to be the alleviation of economic insecurity incident to involuntary unemployment. It is to be noted, however, that we further declared in the *Walgreen case* that the precise issue presented for decision was whether a warehouse was an "establishment" or "other premises" within the contemplation of section 7(d).

In the case of *American Steel Foundries* v. *Gordon*, 404 Ill. 174, we quoted with approval from an administrative decision of the Administrator of Veterans Affairs on pages 184 and 185 of our said opinion. In referring to section 800(b) of the Servicemen's Readjustment Act which is almost identical with section 7(d) of our Unemployment Compensation Act, the Administrator, in denial of the claims urged, stated: "Since a substantial work stoppage may continue regardless of an employer's efforts to resume full scale operations, the termination of the disqualification of a claimant is measured by the cessation of the stoppage of work which is because of a labor dispute rather than by the cessation of the labor dispute which caused the stoppage of work." Thereafter in our said opinion we stated: "Each of the three authorities analyzed holds that, under provisions identical with or substantially the same as those of section 7(d) of the Illinois statute, the ineligibility of a claimant for unemployment compensation benefits does not automatically terminate upon the settlement of the labor dispute or strike and, conversely, where the stoppage of work continues to exist as a necessary aftermath of the labor dispute, as here, the claimant's in-

eligibility for benefits remains until the week after normal production is restored." The extension of our foregoing language to its logical conclusion would apparently support the majority rule.

The difficulty presented in arriving at a solution of the problem is the apparent conflict in the language employed by the legislature in section 1 and in section 7(d) of the act. Section 1 is a declaration of public policy by the legislature and is undoubtedly an expression of the legislative intent. Various expressions contained in this section clearly and definitely deal with the term *involuntary unemployment;* and the subject matter of the entire statute seems to be that same condition of unemployment. Yet section 7(d) of the act does not provide that unemployed workers shall be ineligible to receive benefits merely because their unemployment is not involuntary. This section, however, does provide that in order to be ineligible the employee's unemployment must be due to *stoppage of work* which exists because of a labor dispute at the factory, establishment or other premises at which he is or was last employed. In the case of *Fash* v. *Gordon,* 398 Ill. 210, we stated: "The statute does not differentiate between the stoppage of work caused by the employer and one brought about by the employees, provided the stoppage is caused by a labor dispute. While it is probable that most stoppages of work caused by a labor dispute arise from a strike of the employees, yet it may occur from the employer's inability to operate because of matters arising out of the labor dispute. But, the statute plainly says the employee is ineligible for benefits if the work stops because of such labor dispute. The statute does not undertake to consider which party is responsible for the stoppage, the material element being is there a stoppage of work caused by a labor dispute? * * * In the present case there was * * * involved the renewal of a labor contract between the company and the union. If

the subject matter of the contract is terms and conditions of employment a labor dispute is involved and remains involved until an agreement is reached, or the work stoppage ended." We are, therefore, not concerned with the question as to whether or not in the present case the work stoppage was caused by a strike or a lockout. This court has consistently refused to concern itself with the merits or demerits of the dispute involved in cases of this nature and should continue to pursue a policy of strict neutrality.

The term "stoppage of work" as used in the statute and in the various decisions of this court seems to clearly refer to a stoppage of work of the plant or particular department of a plant and not to the individual unemployment of the worker or workers. The provisions of section 7(d) are a substantial re-enactment of the English National Insurance Act of 1911, and the language of this section has received a settled construction by the English authorities charged with the administration of the English act prior to the adoption of it by Illinois. Under the British interpretation of the word "stoppage," the individual is disqualified for benefits if his unemployment is due to a trade dispute so long as the job which he held continues to be vacant. It would be necessary for the claimant to show that the job vacancy had been filled in some way in order to effect a termination of his disqualification. Vacancies might be terminated by the return of the workers, by the hiring of a replacement, or by a readjustment of work operations. Under the British view, if the vacancy was terminated with no appreciable lapse of time, there would be no stoppage, and consequently no disqualification under the trade dispute disqualification provison. Principles Underlying Labor Dispute Disqualification, by Marsile Hughes, 1946, page 26.

The Supreme Court of Nebraska in *Magner v. Kinney*, 141 Neb. 122, stated: "Obviously if those leaving work are immediately replaced, or if the dispute does not other-

wise interfere with production or operation and these are not diminished, there is no stoppage of work and hence no disqualification." The decisions of the Supreme Courts of Michigan and Arizona in the cases of *Lawrence Baking Company* v. *Michigan U.C.C.*, 308 Mich. 198, 13 N.W. 2d 260, 154 A.L.R. 660, and *Sakrison* v. *Pierce*, 66 Ariz. 162, 185 Pac. 2d 528, 173 A.L.R. 480, are authority for the proposition that striking workers are eligible for unemployment benefits, under similar labor dispute provisions, upon being replaced by other employees and upon resumption of normal operations at the premises of their last employment. The court in the *Sakrison case* stated that the disqualification provision is not ambiguous and that, therefore, the preface or preamble to the law stating the motives and inducement to the making of it is not an essential part of the statute and generally omitted; that it is without force in a legislative sense, being but a guide to the intentions of the framer. A divided court in the *Lawrence Baking Co. case,* involving the disqualification provisons of the Michigan act, which are substantially the · same as our Act, fully discussed both the majority and minority rule. The dissenting opinion in the *Lawrence Baking Co. case* in following the minority rule based its reason for so holding upon the *Mid-Continent Petroleum case* decided in Oklahoma in May, 1943. It is worthy of note that in the *Mid-Continent Petroleum case* the claimants were not represented by counsel and there were two judges dissenting therefrom. Furthermore, the Oklahoma statute has been changed since rendition of the said opinion. Petition for writ of *certiorari* was denied by the Supreme Court of the United States on October 9, 1944, in the *Lawrence Baking Co. case.* The *Mid-Continent Petroleum case* was crticized in the case of *M. A. Ferst Ltd.* v. *Huiet,* 78 Ga. App. 855, 52 S.E. 2d 336. The majority rule was followed in the cases of *In re Steelman,* 219 N.C. 306, 13 S.E. 2d 544; *Saunders* v. *Maryland Unemployment*

*Compensation Board,* 53 Atl. 2d 579; *Carnegie-Illinois Steel Corp.* v. *Review Board,* 117 Ind. App. 379, 72 N.E. 2d 662; *Deshler Broom Factory* v. *Kinney,* 140 Neb. 889, 2 N.W. 2d 332.

We, therefore, conclude that since the cessation of the stoppage of work at the employer's plant on July 10, 1948, claimants are entitled to benefits from said date for a period of twenty-six weeks, as provided for by the act.

As to the claims of the mailing room employees, who, on June 14, joined the composing room employees in their walkout, the Director of Labor found, from the evidence in that case, that they were fully replaced on the same day, that no stoppage of work in that department occurred, and that such employees were entitled to compensation beginning June 14. We cannot say that that finding was against the manifest weight of the evidence, and, in accord with our views herein expressed, the judgment of the superior court affirming the Director of Labor was correct.

The judgments of the superior court of Cook County are affirmed.

*Judgments affirmed.*