**Horace ADAMS et al., Appellants,**

v.

**The INDUSTRIAL COMMISSION of Missouri et al., Respondents.**

**No. 57175.**

Supreme Court of Missouri, Division No. 1.

Feb. 12, 1973.

Robert J. Reinhold of McCullough, Parker, Wareheim & LaBunker, Topeka, Kan., Edwin W. Rooker of McKenzie, Williams, Merrick, Beamer & Wells, Kansas City, for appellants.

Kent E. Whittaker, Charles G. Young, III, Kansas City, for respondent Conchemco, Inc.; Hillix, Brewer & Myers, Kansas City, of counsel.

William C. Nulton of Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for respondents Cook Paint and Varnish Co. and Davis Paint Co.

Lloyd G. Poole, Jefferson City, for respondent The Industrial Comm. of Mo.

Lloyd G. Hanley, Jefferson City, for respondent Div. of Employment Security.

WELBORN, Commissioner.

Appeal from judgment in consolidated cases affirming administrative denial of unemployment compensation to some 300 employees of four paint manufacturing companies in the Kansas City area.

Local No. 754 of the Paint, Varnish and Lacquer Makers Union was the collective bargaining agent for production and maintenance employees of Cook Paint and Varnish Company, Conchemo, Inc., Waggener Paint Company and Davis Paint Manufacturing Company. Collective bargaining agreements between the union and each of the employers expired December 31, 1969. Sixty days before the expiration date, the

union business agent wrote each employer that the union wished to commence negotiations with the employers for the purpose of arriving at a new contract.

During December, 1969, several negotiating sessions between representatives of the union and the employers were held. Agreement was reached on several matters, but no agreement was reached on wages and several other matters.

On January 2, 1970, the employers posted notices that, unless there was substantial progress toward a new contract by January 12, the employers would lay off the employees in the bargaining units represented by the union.

In continuing negotiations in the first part of January, 1970, the union reduced its wage demands, but they were still unacceptable to the employers and there was no agreement in other areas. At the request of the employers, their most recent offer was submitted to the union's membership on January 10 and the offer was rejected.

On January 9 and 10, the following notice was posted at the plants:

"TO: All Production Employees in the Bargaining Unit covered by Local Union No. 754, Paint, Varnish and Lacquer Makers (the "UNION") :

"Because of the present unresolved labor dispute resulting from demands of Local Union No. 754 and because the resulting negotiations with the Union have reached a complete impasse, with an attendant uncertainty of continued stable production, all production employees in the Bargaining Unit covered by the Union are laid off until further notice effective January 12, 1970, at 7:30 A.M."

On January 12, 1970, the employees reported for work and found the doors locked and notices of the lockout posted. The union began picketing the plants with signs indicating that they had been locked out.

Negotiations continued. On April 9, 1970, each of the employers wrote its employees, notifying them that the lockout had ended and requesting that they return to work by April 13. The employees did not return to work until April 20, by which time the parties had agreed upon a new collective bargaining contract.

The employees filed claims for unemployment benefits. Deputies of the Division of Employment Security denied the claims on the grounds that the unemployment was due to the stoppage of work as the result of a labor dispute. An appeals referee upheld the deputies' determination. The employees appealed to the Industrial Commission. The Commission affirmed the deputies' determination, with one member dissenting. On appeal the Jackson County Circuit Court affirmed the "findings and results" of the Industrial Commission.

Appellants here contend that the trial court erred in affirming the findings of the Industrial Commission. They contend that, as a matter of law, the lockout involved is not a "labor dispute" within the meaning of the Missouri Employment Security Act. The provision of that act here involved is § 288.040, RSMo 1969, V.A.M.S., which reads, in part:

"4. (1) A claimant shall be ineligible for waiting week credit or benefits for any week for which the deputy finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute in the factory, establishment or other premises in which he is or was last employed; * * *."

The respondents assert that the commission's determination was of facts, not of law. The difference in the positions of the parties is significant, insofar as judicial review is concerned. § 288.210, RSMo 1969, V.A.M.S., provides, in part:

"In any judicial proceeding under this section, the findings of the commission as

to the facts, if supported by competent and substantial evidence and in the absence of fraud, shall be conclusive, and the jurisdiction of said court shall be confined to questions of law."

Appellants concede that there is no dispute among the parties as to the facts. Their complaint is that, in applying the law to such facts, the commission omitted to take into consideration provisions of the Employment Security Act relevant to the determination of the issues before it.

Specifically, appellants contend that the commission, in the determination of their claims and in the application of § 288.040, subd. 4., was required to take into consideration the "cause-fault" philosophy of the Employment Security Act, as set out in § 288.020, RSMo 1969, V.A.M.S. Section 288.020 is a statement of policy, to be followed as a guide to the interpretation and application of the act. It provides:

"1. As a guide to the interpretation and application of this law, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this state resulting in a public calamity. The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own.

"2. This law shall be liberally construed to accomplish its purpose to promote employment security both by increasing opportunities for jobs through the maintenance of a system of public employment offices and by providing for the payment of compensation to individuals in respect to their unemployment."

Insofar as the question is one of proper application of the law to the undisputed facts, the matter for review is one of law for the court. Poggemoeller v. Industrial Commission, 371 S.W.2d 488, 499 (Mo. App., 1963).

Appellants do not controvert respondents' position that, in most jurisdictions in which the question has arisen under a statute similar to § 288.040, subd. 4., the courts have held that a work stoppage resulting from a lockout arising from a disagreement in matters subject to collective bargaining is a labor dispute entailing disqualification from unemployment benefits. Poggemoeller v. Industrial Commission, supra; Annot., 28 A.L.R.2d 291, 312 (1953).

In the case of In re North River Logging Co., 15 Wash.2d 204, 130 P.2d 64 (1942), the court, in holding that a lockout was a labor dispute within the meaning of the unemployment compensation disqualification provision, stated (130 P.2d at 66):

" * * * Viewed in its social and economic aspects, the lockout is a weapon in the hands of the employers which is a counterpart to the weapon of strike held by the workers. 'A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms.' * * *."

See also: Olusczak v. Florida Ind. Comm., 230 So.2d 31 (Fla.Ct.App., 1970); Buchholz v. Cummins, 6 Ill.2d 382, 128 N. E.2d 900 (1955); Depaoli v. Ernst, 73 Nev. 79, 309 P.2d 363 (1957); Schoenwiesner v. Board of Review, 44 N.J.Super. 377, 130 A.2d 648 (1957); Henzel v. Cameron, 228 Or. 452, 365 P.2d 498 (1961).

Appellants contend that such an approach is "rigid and mechanical." They urge that the approach to the problem which has been followed in Indiana, and which takes into consideration the cause-fault philosophy embodied in the legislative

policy declaration is the correct and proper approach.

The Indiana approach originated in Bootz Mfg. Co. v. Review Board, 143 Ind. App. 17, 237 N.E. 597, reh. den., 143 Ind. App. 111, 238 N.E.2d 472 (1968). In that case, the court affirmed an administrative finding that employees idled because of a lockout were not disqualified under the "labor dispute" provision when negotiations were in a fluid state between the employer and the union. Finding that no impasse existed, the Board found that the lockout was a unilateral act of the employer, and, therefore, not a "labor dispute." In City Pattern & Foundry Co. v. Review Board, 263 N.E.2d 218 (Ind.App., 1970), the court stated that the Bootz rule brought the labor dispute disqualification provision "into harmony with the act's declared purpose." 263 N.E.2d at 224.

Other jurisdictions have rejected the contention that the labor dispute provision of unemployment compensation acts should be qualified by the provisions setting forth the general objective and purpose of such act. In the case of In re North River Logging Co., supra, the court stated (130 P.2d at 65):

"Under a well-established canon of statutory construction, the foregoing [labor dispute] section makes an exception to the generally declared purpose of the act to provide compensation in all cases of involuntary unemployment. In re Steelman, 219 N.C. 306, 13 S.E.2d 544. For the rule is that: 'Where a statute expresses first a general intent, and afterwards an inconsistent particular intent, the latter will be taken as an exception from the former and both will stand.' * * *"

In Buchholz v. Cummins, supra, the court stated (128 N.E.2d at 902):

"The general purpose of the Illinois Act, as expressed in section 1, is to relieve involuntary unemployment. However, sec-

tion 7(d) specifically disqualifies any individual for benefits for any week in which it is found that his unemployment is due to a stoppage of work which exists because of a labor dispute at the establishment at which he is or was last employed. By this provision the Illinois legislature adopted the policy that the State shall not, by payment of unemployment compensation, assist one party to a labor dispute, regardless of fault; and that the State in cases of industrial strife ought not take sides and place blame. This provision was designed to maintain the neutrality of the State in labor disputes. This labor dispute clause is a departure from the general idea of relief from involuntary unemployment. The question of voluntariness in such a case is not the test. Abbott Publishing Co. v. Annunzio, 414 Ill. 559, 112 N.E.2d 101. If a labor dispute results in the closing of a plant or factory, the statute does not place the blame, but considers the resulting unemployment as caused by a labor dispute. American Steel Foundries v. Gordon, 404 Ill. 174, 88 N.E.2d 465; Fash v. Gordon, 398 Ill. 210, 75 N.E.2d 294."

The approach in these cases is in accord with settled principles of statutory construction and avoids the pitfalls inherent in any effort to determine cause and fault in labor disputes. It accords also with legislative recognition that a lockout is a labor dispute under the Employment Security Act, as recognized by § 288.050, subd. 1(2)(b):

"Notwithstanding any other provisions of this law, no work shall be deemed suitable and benefits shall not be denied under this law to any otherwise eligible individual for refusing to accept new work under any of the following conditions:

"a. If the position offered is vacant due directly to a strike, lockout, or other labor dispute."

Therefore, the Industrial Commission did not err as a matter of law in conclud-

ing that the unemployment here involved was "due to a stoppage of work * * * [existing] because of a labor dispute * * *," nor in rejecting the claimants' contention that an "impasse" must have been found to have existed before the labor dispute disqualification became operative.

There is no need to dwell upon what appellants assert will be the "absurd" and "chaotic" products of the approach of the Division of Employment Security and the Industrial Commission to the question here presented. Essentially, the approach is the same as that which received prior judicial approval in the Poggemoeller case, supra. That decision has stood for some nine years, without such disastrous consequences as to persuade the General Assembly that remedial action is necessary. The last session of the General Assembly saw bills which would have excluded lockouts from the labor dispute disqualification fail of passage. H.B. 594 and S.C.S.H.B. 594, 76th General Assembly, 1971 session. Furthermore, as in Sweeney v. Board of Review, 43 N.J. 535, 206 A.2d 345, cited by appellants, the Division of Employment Security and Industrial Commission may also inquire into whether or not a particular work stoppage resulting from a lockout is due to a labor dispute or "unrelated economic reasons." 206 A.2d 348.

Judgment affirmed.

HIGGINS, C., concurs.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the court.

HOLMAN, P. J., and SEILER, J., concur.

BARDGETT, J., concurs in result.